*21*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION AT DETROIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 12-CR-20545 |
| Plaintiff, | HONORABLE VICTORIA A. ROBERTS |
| v. | VIOL: 18 U.S.C. § 1956(h): |
| D-1    MARK JOVETT APSEY, | Conspiracy to Launder Monetary |
| a.k.a. "Jay Apsey," | Instruments |
| a.k.a. "Jay," | |
| D-2    MARTIN GRENIER, | 18 U.S.C. § 1956(a)(2)(A): |
| a.k.a. "Joe Smith," | Cross-Border Money Laundering |
| a.k.a. "Eric LaChance," | |
| a.k.a. "Martin," | 18 U.S.C. § 1952(a): |
| D-3    MARK A. HOPKINS, | Interstate Transportation in Aid of |
| | Racketeering |
| Defendants. | |

_____/

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### COUNT ONE
Conspiracy to Launder Monetary Instruments
(18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)-(ii), 1956(a)(3) , 1957)

D-1    MARK JOVETT APSEY, a.k.a. "Jay Apsey," a.k.a "Jay"
D-2    MARTIN GRENIER, a.k.a. "Joe Smith," a.k.a. "Eric LaChance," a.k.a "Martin"
D-3    MARK A. HOPKINS

In or about March 2009, and continuing through the date of this First Superseding

Indictment, in the Eastern District of Michigan and elsewhere, MARK JOVETT APSEY,

MARTIN GRENIER, MARK A. HOPKINS, and others known and unknown to the Grand Jury,

knowing that the property involved represented the proceeds of some form of unlawful activity,

that is the proceeds of activity which constitutes a felony under State, Federal, or Foreign law, to

wit: the possession with the intent to distribute and distribution of controlled substances, a

felony under Title 21, United States Code, Section 841; bankruptcy fraud, a felony under Title

18, United States Code, Sections 152, 157; tax evasion or tax fraud, felonies under Title 26,

United States Code, Sections 7201-7207; and false pretenses with intent to defraud, a felony

under Michigan Penal Code, Section 750.218; did knowingly, intentionally and unlawfully

combine, conspire, confederate and agree with each other, and with others, both known and

unknown to the Grand Jury, to conduct and/or cause to be conducted, financial transactions

which involve the proceeds of said unlawful activity and property represented to be the proceeds

of specified unlawful activity, and conducted or attempted to conduct a financial transaction

involving property represented to be the proceeds of unlawful activity or property used to

conduct or facilitate specified unlawful activity, with the intent to promote the carrying on of said

unlawful activity, knowing that the transactions were designed, in whole or in part, to conceal

and/or disguise the nature, location, source, ownership and control of the proceeds of specified

unlawful activity and property believed to be the proceeds of specified unlawful activity, and to

avoid transaction reporting requirements under State or Federal law, all in violation of Title 18,

United States Code, Sections 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)-(ii), 1956(a)(3), and

1957.

## MANNER, METHOD, and MEANS

1.      As part of the conspiracy, on or about March 31, 2009, MARK JOVETT APSEY e-
mailed a false document to an attorney entitled, "Secured Promissory Note," which was
transmitted in an effort to establish a legitimate business purpose for a wire transfer of
funds which MARK JOVETT APSEY caused to be deposited into the attorney's lawyer
trust account.

2.      As part of the conspiracy, on or about April 17, 2009, MARK JOVETT APSEY flew
from Chicago, Illinois to Los Angeles, California with approximately Three Hundred
Thousand Dollars ($300,000.00) in United States Currency.

3.      As part of the conspiracy, on or about April 27-28, 2009, MARK JOVETT APSEY
directed co-conspirator AT to fly from Detroit, Michigan to New York and pick up a
suitcase containing Three Hundred Sixty-Five Thousand Four Hundred Forty Dollars
($365,440.00) in United States Currency on a New York City street corner from "Chuck,"
directed co-conspirator AT to return via commercial airline to Detroit, Michigan with the
currency, drafted a false promissory note regarding the source and purpose for the
currency, and caused co-conspirator AT to provide the false promissory note to federal
law enforcement agents.  The $365,440.00 in currency was seized by agents of the United
States Drug Enforcement Administration, Detroit Field Division, at the Detroit
Metropolitan Airport in Romulus, Michigan.

4.    As part of the conspiracy, on or about May 1, 2009 at approximately 12:52 p.m., MARK
JOVETT APSEY made material false statements to a federal law enforcement agent
regarding the source and purpose for the $365,440.00 in cash.

5.    As part of the conspiracy, on or about May 1, 2009 at approximately 5:04 p.m., MARK
JOVETT APSEY e-mailed MARTIN GRENIER, stating, "dude the [f**k] up was
packaging [. . .]," to which MARTIN GRENIER replied at approximately 5:05 p.m.,
"[a]greed on that but Adam didn't think much also[. . .]," to which MARK JOVETT
APSEY replied at approximately 5:19 p.m., "no doubt. cant send a boy to do a mans job."

6.    As part of the conspiracy, on or about May 6-7, 2009, MARK JOVETT APSEY
purchased two cellular telephones, kept one of the phones, provided the other phone to
co-conspirator NA, and instructed co-conspirator NA to turn on and use the phone only at
his (APSEY's) direction; those two cellular telephones were subsequently utilized as a
method of communication by APSEY and other co-conspirators to assist with the
transportation of currency in furtherance of the money laundering activity.

7.    As part of the conspiracy, on or about May 27, 2009, MARK JOVETT APSEY caused
Five Hundred Thousand Dollars ($500,000.00) in U.S. currency funds to be transferred
via wire transaction to the lawyer trust account of MARK A. HOPKINS in Illinois, a
place inside the United States, specifically Chase Bank Account Number XXXXX2563,
from a place outside of the United States, namely Account Number XXX8131 in the
name of IT Data Marketing, Inc. at Union Bancaire Privee, Nassau, Bahamas. On or
about May 28, 2009, MARK A. HOPKINS caused a Cashier's Check payable to the

business of co-conspirator NM to be issued from HOPKINS' lawyer trust account;  that same day, the Cashier's Check was then re-deposited into the lawyer trust account of MARK A. HOPKINS.  On or about May 29, 2009, the $500,000.00 was withdrawn by MARK A. HOPKINS and co-conspirator NM in cash from the lawyer trust account of MARK A. HOPKINS at Chase Bank, Account Number XXXXX2563.

8.     As part of the conspiracy, on or about May 28-29, 2009, MARTIN GRENIER directed co-conspirators NM and NA to meet at a location in Indiana between Detroit, Michigan and Chicago, Illinois for the purpose of delivering and receiving approximately Two Hundred Thousand Dollars ($200,000.00) in United States Currency.

9.     As part of the conspiracy, on or about June 2, 2009, MARK JOVETT APSEY directed co-conspirator NM to fly from Gary, Indiana to Los Angeles, California via a charter flight to transport approximately Six Hundred Twenty-Nine Thousand Dollars ($629,000.00) in United States Currency; MARK JOVETT APSEY paid for the charter flight, and further instructed co-conspirator NM to delivery the currency in Los Angeles to "Joe."

10.    As part of the conspiracy, in or about June 2009, MARTIN GRENIER contacted a Canadian attorney in an effort to create false documentation regarding the source and purpose of the $365,440.00 in cash which had been seized by DEA Detroit on or about April 28, 2009;  the false documents proposed a wholesale purchase of costume jewelry between a company in which MARK JOVETT APSEY was a principal (CNP International) and a New York jewelry designer.

11.   As part of the conspiracy, on or about June 3, 2009, MARK JOVETT APSEY caused
Four Hundred Thirty-Six Thousand Twenty-Eight Dollars and Eighty-Five Cents
($436,028.85) in U.S. currency funds to be transferred via wire transaction into the lawyer
trust account of MARK A. HOPKINS in Illinois, a place inside the United States,
specifically Chase Bank Account Number XXXXX2563, from a place outside of the
United States, namely Account Number XXX8131 in the name of IT Data Marketing,
Inc. at Union Bancaire Privee, Naussau, Bahamas.

12.   As part of the conspiracy, on or about June 4, 2009, MARK A. HOPKINS transferred the
$436,028.85 in U.S. currency funds (which originated in the Bahamas) from his lawyer
trust account (Chase Bank Account Number XXXXX2563), into the business bank
account of co-conspirator NM (Chase Bank Account Number XXXXX2824); co-
conspirator NM then withdrew approximately Ninety-Nine Thousand Five Hundred
Dollars in U. S. currency funds ($99,500.00) from Chase Bank in Detroit, Michigan on or
about June 5, 2009 in the form of: (a) a Cashier's Check payable to JPC in the amount of
Ninety Thousand Dollars ($90,000.00); and (b) Nine Thousand Five Hundred Dollars
($9,500.00) in cash, an amount just under the $10,000 currency transaction reporting
requirement threshold.

13.   As part of the conspiracy, on or about June 5, 2009, MARK JOVETT APSEY and
MARTIN GRENIER instructed co-conspirator NM to transport Cashier's Checks to
Toronto, Ontario, Canada, specifically MARK JOVETT APSEY provided co-conspirator
NM with a Cashier's Check in the amount of Seventy Thousand Dollars ($70,000.00) and

instructed co-conspirator NM to drive the Cashier's Check to Toronto, Ontario, Canada, and MARTIN GRENIER instructed co-conspirator NM to purchase the Cashier's Check in the amount of Ninety-Thousand Dollars ($90,000.00) payable to JPC at Chase Bank in Detroit and then transport the Cashier's Check to Toronto, Ontario, Canada.

14.     As part of the conspiracy, on or about June 8, 2009, MARK JOVETT APSEY purchased a currency counting machine from a currency handling machine manufacturer, arranged to have the currency counting machine available for pickup at the Los Angeles International Airport, instructed co-conspirator NM to pick up the currency counting machine at the Los Angeles airport, and then to call "Joe."

15.     As part of the conspiracy, on or about June 8, 2009, MARK JOVETT APSEY wire transferred approximately Thirteen Thousand Six Hundred Twenty-Four Dollars and Forty-Five Cents ($13,624.45) in U.S. currency funds from a bank account to Automotive Air Charter to pay for a charter air flight for co-conspirator NM to fly to Los Angeles, California with approximately Five Hundred Eighty-Two Thousand Dollars ($582,000.00) in U.S. Currency.

16.     As part of the conspiracy, on or about June 8, 2009, MARK JOVETT APSEY and MARTIN GRENIER directed co-conspirator NM to withdraw approximately Three Hundred Thirty-Six Thousand Dollars ($336,000.00) in United States Currency from NM's business account at Chase Bank (Account Number XXXXX2824), which had been transferred into NM's business account from the lawyer trust account of MARK A. HOPKINS (Chase Bank Account Number XXXXX2563).

17.   As part of the conspiracy, on or about June 8, 2009, MARK JOVETT APSEY and MARTIN GRENIER directed co-conspirator NM to transport approximately Five Hundred Eighty-Two Thousand Dollars ($582,000.00) in United States Currency via charter air flight from Wheeling, Illinois to Los Angeles, California.

18.   As part of the conspiracy, on or about June 8, 2009, MARTIN GRENIER informed co-conspirator NM, via text message, that Los Angeles contact "Joe" was not available and instructed co-conspirator NM to instead call "Tom."

19.   As part of the conspiracy, on or about June 12, 2009, MARTIN GRENIER directed co-conspirator NM to pick up approximately Two Hundred Fifty Thousand Dollars ($250,000.00) in United States Currency in Boston from "Tommy," provided co-conspirator NM with the contact phone number for "Tommy," and caused co-conspirator NM to pick up approximately $250,000.00 in cash from two Asian males in Lowell, Massachusetts on or about June 13, 2009.

20.   As part of the conspiracy, on or about June 14, 2009, MARK JOVETT APSEY directed co-conspirator NM to deliver approximately Two Hundred Fifty Thousand Dollars ($250,000.00) in United States Currency to a residence in Bloomfield Hills, Michigan.

21.   As part of the conspiracy, on or about June 14, 2009, MARK JOVETT APSEY directed co-conspirator NA to transport approximately Seven Hundred Thousand Dollars ($700,000.00) in United States Currency from the Eastern District of Michigan to Los Angeles, California.

22.    As part of the conspiracy, on or about June 25, 2009, MARK JOVETT APSEY utilized a hotel room in Atlanta, Georgia to count approximately Six Hundred Eighty-Five Thousand Nine Hundred Nineteen Dollars ($685,919.00) in United States Currency.

23.    As part of the conspiracy, on or about June 26, 2009, MARTIN GRENIER directed two co-conspirators, NM and MARK A. HOPKINS, to deliver cash to Los Angeles;  the two co-conspirators, NM and MARK A. HOPKINS, drove approximately Six Hundred Eighty-Five Thousand Nine Hundred Nineteen Dollars ($685,919.00) in United States Currency from Atlanta, Georgia to Los Angeles, California.

24.    As part of the conspiracy, on or about June 29, 2009, MARTIN GRENIER instructed co-conspirator NM to pick up cash from "Roberto" in Boston; co-conspirator NM picked up approximately Two Hundred Ten Thousand Dollars ($210,000.00) in United States Currency from "Roberto" at a residence in South Easton, Massachusetts, and, on or about June 30, 2009, co-conspirator NM accepted delivery at his Boston hotel room of approximately Two Hundred Twenty-One Thousand Dollars ($221,000.00) in United States Currency from "Ryan."

25.    As part of the conspiracy, on or about June 30, 2009, MARTIN GRENIER directed co-conspirator NM to travel to Kingston, New York to pick up cash;  MARK A. HOPKINS and co-conspirator NM collected approximately Six Hundred Eighteen Thousand Dollars ($618,000.00) in United States Currency in a parking lot in Kingston, New York;  MARK A. HOPKINS and co-conspirator NM drove from Kingston, New York to Chicago, Illinois with approximately One Million Forty-Nine Thousand Dollars in United States

Currency (comprised of the approximately $618,000.00 in cash from the parking lot in Kingston, New York, the approximately $210,000.00 obtained from "Roberto" in Boston, and the approximately $221,000.00 delivered to the Boston hotel room by "Ryan").

26.   As part of the conspiracy, on or about June 30, 2009, MARK JOVETT APSEY caused approximately Five Hundred Twenty-Four Thousand Dollars ($524,000.00) in U.S. currency funds to be transferred via wire transaction from a place outside of the United States, namely from Credicorp Bank in Panama (Account Number XXXX3696 in the name of Chadron Resources), to a place inside the United States, namely an Illinois business bank account of co-conspirator NM (Chase Bank Account Number XXXXX2824), resulting in a deposit of approximately Five Hundred Twenty-Three Thousand Nine Hundred Sixty-Five Dollars ($523,965.00) into the business bank account of co-conspirator NM.

27.   As part of the conspiracy, on or about July 1, 2009, MARK JOVETT APSEY paid for a charter air flight for co-conspirator NM who then traveled and transported approximately One Million Forty-Nine Dollars ($1,049,000.00) in United States Currency from Chicago to Van Nuys, California.

28.   As part of the conspiracy, on or about July 1, 2009, MARTIN GRENIER instructed co-conspirator NM to deliver approximately Seven Hundred Fifty Thousand Dollars ($750,000.00) in United States Currency to "LA Tommy," and informed co-conspirator NM that approximately Three Hundred Fifty Thousand Dollars ($350,000.00) in United States Currency would be picked up from him by a different person in Los Angeles.

29.   On or about July 1, 2009, "LA Tommy" came to the Los Angeles hotel room of co-conspirator NM to pick up the approximately $750,000.00 in cash, which constituted the proceeds of narcotics trafficking and/or which was used or was intended to be used to facilitate the sale or purchase of cocaine; "LA Tommy" left the hotel room of co-conspirator NM carrying part of the currency out of the room and immediately thereafter, "LA Tommy" and co-conspirator NM were arrested by officers of the Anaheim, California Police Department. A total of One Million Forty-Nine Thousand Three Hundred Fifty-Four Dollars ($1,049,354.00) in U.S. Currency was seized by law enforcement agents. The cellular telephone of co-conspirator NM was also seized by law enforcement agents.

30.   As part of the conspiracy, on or about July 2-3, 2009, MARTIN GRENIER attempted to contact co-conspirators NM and "LA Tommy" via cellular telephone following the arrest of co-conspirator NM in California.

31.   On or about July 3, 2009, less than 48 hours following his arrest and the seizure of $1,049,354.00 in cash, co-conspirator NM caused two checks totaling approximately Five Hundred Thirteen Thousand Dollars ($513,000.00) in U.S. currency funds to be issued from NM's business account at Chase Bank (Account Number XXXXX2824), including: (a) Check Number 1019 payable to Hopkins & Associates in the amount of Two Hundred Seventy-Five Thousand Dollars ($275,000.00) which was deposited on or about July 3, 2009 into the lawyer trust account of MARK A. HOPKINS (Chase Bank Account Number XXXXX2563); and (b) Check Number 1021 payable to Hopkins & Associates

Page 11 of 20

in the amount of Two Hundred Thirty-Eight Thousand Dollars ($238,000.00) which was deposited on or about July 6, 2009 into the lawyer trust account of MARK A. HOPKINS (Chase Bank Account Number XXXXX2563).

32.   As part of the conspiracy, in or about July 2009, MARK JOVETT APSEY contacted an attorney to represent co-conspirator NM for purposes of submitting a claim to the $1,049,354.00 in cash that had been seized by law enforcement in California.

33.   As part of the conspiracy, on or about July 9, 2009, MARK A. HOPKINS transferred approximately One Hundred Fifty-Five Thousand Dollars ($155,000.00) in U.S. currency funds from his lawyer trust account (Chase Bank Account Number XXXXX2563) to Fifth Third Bank Account Number XXXX0206 in the name of Hopkins & Associates, resulting in the withdrawal, on or about July 21, 2009 by MARK A. HOPKINS of approximately One Hundred Fifty Thousand Dollars ($150,000.00) in United States Currency, which was then utilized in part by co-conspirator NM toward the purchase of a 2009 Mercedes-Benz M Class ML63 vehicle and a 2009 MV Agusta F4-1078 motorcycle, which were both titled in the name of a nominee owner.

34.   As part of the conspiracy, on or about July 14, 2009, MARK A. HOPKINS withdrew approximately Sixty-Eight Thousand Dollars ($68,000.00) in United States Currency from his lawyer trust account (Chase Bank Account Number XXXXX2563), which was then utilized in part by co-conspirator NM toward the purchase of the 2009 Mercedes-Benz M Class ML63 vehicle and the 2009 MV Agusta F-4 1078 motorcycle, both titled in the name of a nominee owner.  The total purchase price of Thirty-Nine Thousand One

Hundred Sixty-Six Dollars and Sixty-Six Cents ($39,166.66) for the 2009 MV Augusta F4-1078 motorcycle was paid in cash by co-conspirator NM. The total purchase price for the 2009 Mercedes Benz ML6 was Ninety-Seven Thousand Two Hundred Eleven Dollars and Sixty-Eight Cents ($97,211.68), of which approximately Forty-One Thousand Dollars ($41,000.00) was paid for in cash by co-conspirator NM.

35.  As part of the conspiracy, on or about August 28, 2009, MARK JOVETT APSEY submitted a claim to the United State Drug Enforcement Administration, on behalf of CNP International, asserting an ownership interest in the $1,049,354.00 in cash seized from co-conspirator NM on July 1-2, 2009 in California.

36.  As part of the conspiracy, on or about October 29, 2009, MARK JOVETT APSEY created false documents related to a purported purchase of jewelry in an attempt to fabricate a legitimate business purpose for the $365,440.00 in United States Currency which was seized by DEA Detroit on or about April 28, 2009.

37.  As part of the conspiracy, on or about December 10, 2009, during the execution of a federal search warrant of his residence in Bloomfield Hills, Michigan, MARK JOVETT APSEY made material false statements to federal agents regarding the source and origin of the $1,049,354.00 in cash seized in California in July 2009, and regarding the source of the approximately $685,919.00 in cash which was in his possession at the hotel room in Atlanta, Georgia in June 2009.

38.   As part of the conspiracy, on or about December 11, 2009 (the day after the search warrant had been executed at his residence), MARK JOVETT APSEY flew from Detroit, Michigan to Houston, Texas and met with a purported member of a Drug Trafficking Organization where APSEY attempted to pick up approximately Two Hundred Fifty Thousand Dollars ($250,000.00) in currency in order to launder the funds for the Drug Trafficking Organization.

39.   As part of the conspiracy, in or about January 2010 in the Eastern District of Michigan, MARK JOVETT APSEY provided co-conspirator TG with a duffel bag containing in excess of Four Hundred Thousand Dollars ($400,000.00) in United States Currency, a portion of which was used to purchase a check cashing business in Detroit.

40.   As part of the conspiracy, on or about February 19, 2010, MARK JOVETT APSEY caused the purchase of bank bags for the purpose of transporting bulk currency.

41.   As part of the conspiracy, between February 19, 2010 and April 9, 2010, said dates being approximate, MARK JOVETT APSEY caused approximately One Million One Hundred Twenty-Four Dollars ($1,124,000.00) in United States Currency to be shipped to Scottsdale, Arizona and Los Angeles, California where the currency packages were delivered to and accepted by co-conspirator BS, who then provided the cash to individuals known and unknown to the Grand Jury for further distribution to Drug Trafficking Organizations in the following manner:

a.      on or about February 19, 2010, MARK JOVETT APSEY caused the shipment of approximately Seven Hundred Twenty-Four Thousand Dollars ($724,000.00) in United States Currency from the check cashing store in Detroit, via armored car service and Federal Express, to Scottsdale, Arizona;

b.      on or about March 25, 2010, MARK JOVETT APSEY caused the shipment of approximately Two Hundred Thousand Dollars ($200,000.00) in United States Currency from the check cashing store in Detroit, via armored car service and Federal Express, to Los Angeles, California;  and

c.      on or about April 9, 2010, MARK JOVETT APSEY caused the shipment of approximately Two Hundred Thousand Dollars ($200,000.00) in United States Currency from the check cashing store in Detroit, via armored car service and Federal Express, to Los Angeles, California.

All in Violation of Title 18, United States Code, Sections §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)-(ii), 1956(a)(3), and 1957.

## COUNT TWO

Cross-Border Money Laundering
18 U.S.C. §§ 1956(a)(2)(A)

D-1    MARK JOVETT APSEY, a.k.a. "Jay Apsey," a.k.a "Jay"

The allegations contained in Count One of this Indictment are hereby incorporated by reference.  On or about March 25, 2009, MARK JOVETT APSEY transferred or caused to be transferred approximately Four Hundred Eighty-Eight Thousand Dollars ($488,000.00) in U.S. currency funds to a place in the United States, namely the IOLTA account of an attorney in the

Eastern District of Michigan, specifically Key Bank Account Number XXXXXXXX5880, from a place outside of the United States, namely Account Number XXX8131 in the name of IT Data Marketing, Inc. at Union Bancaire Privee, Nassau, Bahamas, with the intent to promote the carrying on of specified unlawful activity, all in violation of Title 18, United States Code, Section 1956(a)(2)(A).

### COUNT THREE

Cross-Border Money Laundering
18 U.S.C. §§ 1956(a)(2)(A)

D-1    MARK JOVETT APSEY, a.k.a. "Jay Apsey," a.k.a "Jay"

The allegations contained in Counts One and Two of this Indictment are hereby incorporated by reference. On or about April 15, 2009, MARK JOVETT APSEY transferred or caused to be transferred approximately Four Hundred Thousand Dollars ($400,000.00) in U.S. currency funds to a place in the United States, namely the IOLTA account of an attorney in the Eastern District of Michigan, specifically Key Bank Account Number XXXXXXXX5880, from a place outside of the United States, namely Account Number XXX8131 in the name of IT Data Marketing, Inc. at Union Bancaire Privee, Nassau, Bahamas, with the intent to promote the carrying on of specified unlawful activity, all in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## COUNT FOUR

Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises,
Aiding and Abetting
18 U.S.C. §§ 1952(a)(1), 1952(a)(3), 2

D-2   MARTIN GRENIER, a.k.a "Joe Smith," a.k.a. "Eric LaChance," a.k.a. "Martin"

The allegations contained in Counts One, Two, and Three of this Indictment are hereby incorporated by reference. On or about May 29, 2009, MARTIN GRENIER, and others known and unknown to the Grand Jury, did knowingly travel, or aid and abet others in traveling, in interstate or foreign commerce by causing NA to transport approximately Two Hundred Thousand Dollars ($200,000.00) in United States Currency from the Eastern District of Michigan to a restaurant in Merrillville, Indiana, with the intent to distribute the proceeds of unlawful activity and with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, all in violation of Title 18, United States Code, Sections 1952(a)(1), 1952(a)(3), and 2.

## COUNT FIVE

Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises,
Aiding and Abetting
18 U.S.C. §§ 1952(a)(1), 1952(a)(3), 2

D-1   MARK JOVETT APSEY, a.k.a. "Jay Apsey," a.k.a. "Jay"

The allegations contained in Counts One, Two, Three, and Four of this Indictment are hereby incorporated by reference. On or about February 19, 2010, MARK JOVETT APSEY, and others known and unknown to the Grand Jury, did knowingly use the mail or a facility in interstate or foreign commerce, and aid and abet the same, by causing approximately Seven

Hundred Twenty-Four Thousand Dollars ($724,000.00) in United States Currency to be collected by an armored car service from a check cashing business in Detroit and shipped via Federal Express to Scottsdale, Arizona, with the intent to distribute the proceeds of unlawful activity and with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, all in violation of Title 18, United States Code, Sections 1952(a)(1), 1952(a)(3), and 2.

## CRIMINAL FORFEITURE ALLEGATIONS
18 U.S.C. § 982(a)(1)
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461

1.   Upon conviction of one or more violations of Conspiracy to Launder Monetary Instruments or Money Laundering, in violation of Title 18, United States Code, Section 1956 or 1957, as alleged in Counts One, Two, and Three of this Indictment, Defendants MARK JOVETT APSEY, MARTIN GRENIER, and MARK A. HOPKINS shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), their right, title, and interest in any property, real or personal, involved in such offenses or any properties traceable to such property.

2.   Upon conviction of one or more violations of Interstate Transportation in Aid of Racketeering, Aiding and Abetting, in violation of Title 18, United States Code, Sections 1952, 2, as alleged in Counts Four and Five of this Indictment, Defendants MARK JOVETT APSEY and MARTIN GRENIER shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) together with Title 28, United States

Code, Section 2461(c), their right, title, and interest in any property, real or personal,

which constitutes or is derived from proceeds traceable to such offenses.

3.     Property subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(1), and

18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c), includes, but is not limited

to the following:

        a.     Three Hundred Sixty-Five Thousand Four Hundred Forty Dollars

            ($365,440.00) in United States Currency, seized at the Detroit

            Metropolitan Airport on or about April 28, 2009 by agents of the

            United States Drug Enforcement Administration;

        b.     One Mercedes-Benz M Class ML63 Motor Vehicle bearing VIN

            4JGBB77E89A489988; and

        c.     One MV Augusta F4-1078 Motorcycle bearing VIN

            ZCGFAFVW69V009300.

4.     Substitute Assets:  Pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1)-(2), each defendant shall

forfeit substitute property, up to the value of the properties identified for forfeiture, if, by

any act or omission of the defendant, the properties identified for forfeiture cannot be

located upon the exercise of due diligence; have been transferred or sold to, or deposited

with, a third party; have been placed beyond the jurisdiction of the court; have been

substantially diminished in value; or have been commingled with other property which

cannot be divided without difficulty.

## CRIMINAL FORFEITURE MONEY JUDGMENT

Upon conviction of one or more of the violations of Title 18, United States Code, Sections 1952 or 1956, as alleged in Counts One through Five of this Indictment, Defendants MARK JOVETT APSEY, MARTIN GRENIER, and MARK A. HOPKINS shall be ordered to pay a sum of money equal to Six Million Eight Hundred Thirty-Six Thousand Eight Hundred Twenty-Four Dollars ($6,836,824.00) in United States Currency Funds, for which Defendants MARK JOVETT APSEY, MARTIN GRENIER, and MARK A. HOPKINS are jointly and severally liable, representing the amount of proceeds obtained as a result of their offenses

THIS IS A TRUE BILL.

s/Grand Jury Foreperson
Foreperson

BARBARA L. McQUADE
United States Attorney

/s/ Rita E. Foley
RITA ELIZABETH FOLEY
Assistant United States Attorney
2001 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9520
rita.foley@usdoj.gov
Bar No. P-56361

/s/ Julie A. Beck
JULIE A. BECK
Assistant United States Attorney
2001 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9717
julie.beck@usdoj.gov
Bar No. P-53291

Dated:  November 14, 2012

# ORIGINAL

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number**<br>12-20545 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

## Reassignment/Recusal Information This matter was opened in the USAO prior to August 15, 2008   [ ]

## Companion Case Information

| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Companion Case Number:** 09-cv-13564 |
|---|---|
| | **Judge Assigned:** Bernard A. Friedman |
| ☒ **Yes**    ☐ **No** | **AUSA's Initials:** _____ |

**Case Title:** USA v.   MARK JOVETT APSEY, et al.,

**County where offense occurred :**   Wayne

**Check One:**    ☒ **Felony**        ☐ **Misdemeanor**        ☐ **Petty**

_____Indictment/_____Information --- **no prior complaint.**

_____Indictment/_____Information --- based upon prior complaint [Case number: ]

_X_ Indictment/_____Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No: 12-cr-20545** _____    **Judge:**  **Victoria A. Roberts**

☐    Original case was terminated; no additional charges or defendants.

☐    Corrects errors; no additional charges or defendants.

☐    Involves, for plea purposes, different charges or adds counts.

☒    Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** |
|---|---|
| Mark A. Hopkins | 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)-(ii), 1956(a)(3), 1957 |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

_November 14, 2012_
Date

RITA ELIZABETH FOLEY
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone:  (313) 226-9520
Fax: (313) 226-3265
E-Mail address:  rita.foley@usdoj.gov
Attorney Bar #:  P-56361

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

10/13/09